**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ x

**WILLIAM PAYNE III,**

Plaintiff,

-v-

**THE CITY OF NEW YORK,**

Defendant.

------------------------------------------------ x

**Case No.: 7:25-cv-8028(NSR)**

**FIRST AMENDED COMPLAINT**

Plaintiff William Payne III hereby charges the above-named defendant, the City of New York, with unlawful and discriminatory employment practices based on race and retaliation as follows:

## PRELIMINARY STATEMENT

1. Plaintiff William Payne III ("Mr. Payne" or "Plaintiff"), a former firefighter with the Fire Department of the City of New York ("FDNY"), Ladder Company 24 ("Ladder 24" or the "Firehouse"), was terminated from his position just weeks after he filed grievances about racial discrimination and wage theft.

2. As discussed more fully below, during Mr. Payne's employment with the FDNY, he was routinely required to work "off the clock" both before and after his scheduled shift. As a result, Mr. Payne worked hundreds of hours without compensation.

3. In addition, as more fully discussed below, Plaintiff, who is Black, was treated differently than his non-Black peers, including being denied a partner with whom to do "mutual" shifts (defined *infra* at Part III), even as all his non-Black peers were assigned mutual partners.

4. Just weeks after Mr. Payne complained about racially discriminatory treatment and being required to work several hours per day without pay, the FDNY unceremoniously terminated his employment without cause.

5. The FDNY has discriminated against Mr. Payne based on his race and has unlawfully retaliated against him. The FDNY treated Mr. Payne differently as compared to similarly situated employees who were not Black and did not complain about discrimination or uncompensated work. These acts of discrimination substantially interfered with Mr. Payne's employment, and the retaliatory termination caused his dream of becoming a New York City firefighter to go up in smoke.

6. As a result, Mr. Payne brings this action to seek redress for the unlawful employment practices committed against him, including the FDNY's discriminatory treatment of him due to his race, as well as unlawful retaliation for: (a) his complaints of racial discrimination in violation of Section 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1983 ("Section 1983"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("NYCHRL"); (b) his complaints of wage theft in violation of the Fair Labor Standards Act ("FLSA"); and (c) invoking his rights under the Family Medical Leave Act of 1933 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Mr. Payne's rights under Section 1983, the FLSA, and the FMLA. The Court has supplemental jurisdiction over Mr. Payne's related claims arising under New York state and city law pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

9. Plaintiff William Payne is a former FDNY firefighter who resides in New York, New York. At all relevant times, Mr. Payne qualified as an "employee" under all relevant statutes.

10. At all relevant times, Mr. Payne was a "covered employee" under the FMLA. On May 22, 2023, when Mr. Payne's FMLA leave request was approved, he had worked at the FDNY for over twelve months, had worked at least 1,250 hours during the preceding twelve-month period, and was employed at a worksite at which the FDNY employed at least 50 employees within 75 miles.

11. The City of New York is a municipal corporation of the State of New York. At all relevant times, the City of New York controlled the terms and conditions of Plaintiff's employment and qualified as an "employer" and "employed" Mr. Payne under all relevant statutes.

12. The FDNY is a department of the government of the City of New York City that provides fire protection services, technical rescue/special operations services, chemical, biological, radiological, nuclear, and high-yield explosive/hazardous materials response services and emergency medical response services within the five boroughs. The FDNY is the largest fire department in America. As of 2025, however, 67.9% of uniformed firefighters were white and only 10.9% were Black, while 21.2% were Hispanic, Asian, and other races. By comparison, among New York City Police Department ("NYPD") officers, reporting reflects that in 2025, approximately 33.5% of officers were white, and 66.4% were Black, Hispanic, and Asian.

13. Until 2019, the FDNY issued training materials to firefighters that included a memo abhorrently stating that: "Motivation in firefighting is largely a matter of team building … Team building encounters ***special problems*** when the team has to readjust to new members, ***minorities or females***, or members who are problems because they do not behave." (emphasis added).[1] Such materials reflected the

---

[1] *See* https://www.insider.com/fdny-training-manual-said-women-and-minorities-hamper- team-building-2021-10 (last visited January 26, 2026).

deeply rooted, institutionalized racism that, sadly, still pervades parts of the FDNY to this day.

## FACTUAL ALLEGATIONS

14. William Payne III is a 37-year-old Black man.

15. Mr. Payne joined the FDNY on March 28, 2022, initially as a probationary ("Probie") firefighter. Mr. Payne graduated from the FDNY Academy (the "Academy") on or about August 9, 2022, and was then assigned to work as a probationary firefighter at Ladder 24 in Midtown Manhattan. The probationary status was to be in effect for 18 months.

16. Throughout the duration of his employment with the FDNY, Mr. Payne performed his duties in an exemplary manner and received a unit citation for his excellent work. Nevertheless, the FDNY subjected Mr. Payne to disparate treatment based on his race and retaliated against him for his engagement in protected activity when he complained of discrimination and wage-and-hour violations.

### I. Mr. Payne Is Required to Work Several Unpaid Hours Each Day He Works

17. Upon joining the FDNY Academy, Mr. Payne and his Academy peers were required to work several hours per shift "off the clock."

18. Specifically, while in the Academy, Mr. Payne was required to arrive at the auditorium where trainings were held at 5:30 a.m., even though the first training, or "evolution," did not start until 7:00 a.m. He was also required to stay there long past the end of the last evolution at 3:55 p.m.; he was generally not dismissed until 5:30 p.m. or later. He was not compensated for time worked before 7:00 a.m. or after 3:55 p.m.

19. Upon graduating from the Academy, Mr. Payne found similar unpaid work protocols in place at Ladder 24. Specifically, probationary firefighters were regularly required to report to the firehouse two hours before each shift - time that was not compensated at all. Consequently, Mr. Payne had to work several uncompensated hours per shift.

20. This unlawful practice continued every, if not virtually every, working day throughout Mr.

Payne's probationary period. An attorney for the firefighters' union acknowledged to Mr. Payne that the issue of unpaid work was "a global issue" at the FDNY.[2] In other words, the FDNY is and has been on notice that probationary firefighters are required to work without pay on a regular basis and knowingly allows this practice to continue uncorrected.

## II. Mr. Payne Is Subjected to Racially Disparate Treatment by the FDNY

21. Upon joining Ladder 24, Mr. Payne was one of four Black men in his firehouse. As described below, Mr. Payne was thereafter subjected to racially disparate treatment by leadership within Engine 1/ Ladder 24 and top FDNY brass..

22. For instance, on November 11, 2022, Mr. Payne was scheduled to work a holiday evening overtime shift. Mr. Payne highly prized overtime work since it helped offset all the hours of unpaid work that the FDNY required of him as a probationary firefighter.

23. Another probationary firefighter, Andres Oviedo, texted Mr. Payne at 9:42 a.m. to tell him the overtime shift for which he was scheduled that evening had been removed from his schedule and assigned to Mr. Oviedo, who was not Black.

24. This was not the only time when Mr. Payne encountered the FDNY's practice of prioritizing and favoring non-Black attorneys over Black firefighters when it came to offering overtime work.

25. Further, Ladder 24 required its firefighters to pay a "house tax," the proceeds of which were believed to be allocated to pay for cable television, internet access, coffee, and other expenditures. In addition, whenever a firefighter sadly perished in the line of duty, the FDNY would sell special t-shirts to raise money for the fallen firefighter's family. The cost of such items was charged to a firefighter's

---

[2] In a call with a union attorney named Nicholas Papain after his termination, Mr. Payne referenced the practice within the FDNY of "being told that you have to be there and being forced to be there and being held past your actual time and not being paid for it. Yeah, that's a form of hazing." Mr. Papain replied: "Yeah, so I mean, that's a, that's a global issue, right. I mean, that's not just unique to you."

house tax.

26. When Mr. Payne inquired into what Ladder 24 used the "house tax" for, he was told by Firefighter Angelo Bencivenga that he did not need to know because Mr. Payne was not the "commissar of its money."

27. In a generous show of support for families of firefighters killed in the line of duty, Mr. Payne purchased several fundraising shirts in the early months of 2023. As a result of these extra purchases, his "house tax" balance totaled $180 in March 2023. Senior Ladder 24 Firefighter, Chris Nock, informed Mr. Payne that he allegedly had the highest house tax balance and, as punishment, he had to work all of the "house watch" shifts, or shifts in which a firefighters was responsible for acknowledging and announcing all emergency calls to the firehouse from the hours of midnight to 9 a.m. The length of house watch shifts were supposed to be limited to three hours pursuant to FDNY requirements.

28. Yet, Mr. Payne was regularly, for a period of approximately two months (March 2023 to May 2023), forced to work a full ***9-hour house watch*** shift approximately three to four times per week between midnight and 9 a.m. He had to stay alert all night while on house watch, even after working a full regular shift during the daytime. Mr. Payne understood this deliberate deprivation of sleep as a form of hazing (prohibited at the FDNY), targeted at him as one of the only Black firefighters at Ladder 24.

29. Notably, Mr. Payne was assigned house watch far more frequently than his non-Black colleagues. During his employment, Mr. Payne observed that he was routinely required to work a house watch shift, in addition to his regular shift, every time he worked overnight shifts, while similarly situated non-Black firefighters were not required to do so at such frequency.

30. In fact, upon information and belief, a white firefighter, Lt. Hughs, who had a higher house tax balance than Mr. Payne, was never required to work a house watch shift.[3]

---

[3] Although Lt. Hughs was a Lieutenant, and Lieutenants were typically not required to perform house watch, Ladder 24's policy was that *any* firefighter whose house tax exceeded $100 was required to work house watch shifts.

31. Indeed, per Chapter 20 of the FDNY regulations, all firefighters were required to work house watch shifts. Notably, probationary firefighters were supposed to be "monitored by the Officer on duty or by an experienced member," and house watch duties were to be divided into "3-hour periods." Yet, in practice, Mr. Payne was discriminatorily singled out for house watch shifts. He was routinely required to work house watch shifts from midnight to 9:00 a.m.—a nine-hour stretch that far exceeded the three-hour periods prescribed by the FDNY policy—and he was left to perform those overnight house watch duties without the monitoring the policy required. Meanwhile, non-Black firefighters were assigned far fewer (or no) house watch shifts, and when non-Black firefighters were assigned house watch shifts, they were limited to the three hours prescribed by the policy.

## III. Mr. Payne Is Not Assigned a "Mutuals" Partner Unlike His Non-Black Peers

32. FDNY firefighters often work "mutual" shifts ("Mutuals"), in which two firefighters exchange shifts to allow for flexibility, rest, recovery, and time off. For example, a firefighter who wants to complete his required work hours earlier in the week so he can take days off later may arrange mutuals with another firefighter who will work those hours later in the week. It is not uncommon for the other firefighter with whom a firefighter does Mutuals to come from another firehouse within their Battalion.

33. The non-Black Probies at the Engine 1/ Ladder 24 firehouse were assigned partners with whom to do "mutual" shift exchanges shortly after joining the firehouse.

34. Mr. Payne, however, was never assigned a Mutuals partner. He could only do a Mutual on the occasions where he could find another firefighter willing to do the Mutual with him.

35. As a result, while other Probies were able to work a Mutual shift approximately twice a week, Mr. Payne was only occasionally able to work a Mutual shift.

36. On April 13, 2023, Mr. Payne was scheduled to work a 9:00 a.m. to 6:00 p.m. shift at Ladder 24, followed by a Mutual shift with a firefighter from another house that evening. He informed Captain Kevin Condon about the Mutual on April 11, 2023, and it was approved.

37. Yet, on April 12, 2023, at 6:12 p.m., Mr. Nock informed Mr. Payne that his Mutual for April 13 was cancelled. It was not clear why Mr. Payne received this information from a colleague rather than Capt. Condon, with whom he had worked all day, or another member of management with the power to alter schedules. Mr. Payne was not offered any reason for the cancellation.

38. Capt. Condon then told Mr. Payne, who was one of only two Black firefighters at Engine 1/ Ladder 24 at the time, that he was only permitted to work Mutuals with firefighters from Engine 1/ Ladder 24, which drastically limited his ability to do Mutuals at all given that the mostly white firefighters at Engine 1/ Ladder 24 routinely refused to do Mutuals with Mr. Payne, and he was never assigned a Mutuals partner.

39. In contrast, when a non-Black probationary firefighter named Vincent Corallo lost his first assigned Mutuals partner when the partner sustained a long-term injury that caused him to go on medical leave, he was promptly assigned a new mutuals partner. The new partner unfortunately also sustained a long-term injury and went on leave but, once again, Mr. Corallo was swiftly assigned a new partner. In other words, Mr. Corallo, a non-Black Probie, had a total of three Mutual partners in a six-month period, whereas Mr. Payne, who had been employed at that time for 11 months, never had an assigned Mutual partner at all.

40. Notably, the FDNY's Mutual Exchange Guidelines state, "Application for mutual exchange of tours, below the rank of Lieutenant, may be submitted by members of equal rank assigned or detailed within their assigned Battalion." Indeed, the policy does not limit firefighters to work Mutuals with just firefighters from their Engine or Ladder but allows firefighters to do Mutuals with those in their Battalion.

41. However, even when Mr. Payne complied with the Mutual Exchange Guidelines, he was still subject to discipline. By way of example, on May 30, 2023, Mr. Payne accepted a Mutuals shift with another firefighter at Engine 26 (an Engine within his Battalion). The next day, on May 31, 2023, Lt. Doug

Lopez gave Mr. Payne a "command discipline" for accepting the Mutuals shift from someone in a different Engine because Capt. Condon had arbitrarily told Mr. Payne that he could not accept Mutuals from another Ladder, even though FDNY policy permitted it.

42. Mr. Payne then texted Lt. Lopez on June 5, 2023, regarding the command discipline, requesting that a "further investigation and interview with borough command" into how the Mutuals policy was being applied differently to him than to other non-Black firefighters before he decided whether to "elect to accept or reject any penalty." Mr. Payne further explained that he was entitled to an investigation pursuant to the FDNY complaint policy that characterized "hav[ing such] matter[s] made the subject of a judicial proceeding heard before the N.Y.C. Office of Administrative Trials and Hearings" as a firefighter's "right."

43. Lt. Lopez responded to Mr. Payne and told him that he would "pass the information to the captain."

44. Upon information and belief, Lt. Lopez never relayed Mr. Payne's message to Capt. Condon.

45. As a result of the command discipline, on June 20, 2023, Mr. Payne attended an FDNY Bureau of Investigations and Trials ("BITS") hearing. However, when Mr. Payne attempted to bring up that he was being discriminated against and hazed by those in his Engine/Ladder and at the FDNY, he was told that the BITS hearing was not for doing so. Notably, Mr. Payne was never given any punishment for this command discipline, and it was not brought up again.

46. As a result, Mr. Payne was effectively prevented from doing Mutuals with any regularity, unlike other non-Black firefighters in his firehouse.

## IV. Mr. Payne is Told He "Should Not Be Asking" About Protected Leave and Is Discouraged from Taking FMLA Leave

47. On or around May 10, 2023, Mr. Payne spoke with Capt. Condon about his intent to take

Family Medical Leave ("FMLA") to care for his daughter, who has a blood disorder. However, instead of being given information on how to formally request such leave, Capt. Condon told Mr. Payne told that because he had "just started," he "should not be asking" about taking leave, in an attempt to discourage him from pursuing legally protected leave.

48. Ultimately, on May 22, 2023, Mr. Payne's request for intermittent FMLA leave was approved from May 22, 2023, to May 21, 2024.

49. Nevertheless, Mr. Payne was prevented from being able to take FMLA leave when needed; instead, his leave requests were treated as discretionary and subject to approval. By way of example, in or around June 2023, when Mr. Payne requested a day off to care for his daughter, who was having a pain crisis associated with her Sickle Cell disease, Lt. Robert J. Derowitz told Mr. Payne that he would decide later whether to approve the leave request and would let Mr. Payne know only after making that determination.

50. It was clear that Mr. Payne's requests for FMLA leave were not welcomed at Ladder 24, which signaled to Mr. Payne that his supervising officers may treat others attempts to invoke his legal rights and protections with hostility rather than support.

## V. Mr. Payne Engages in Protected Activity, But the FDNY Ignores His Complaints and Escalates Retaliation

51. On or around June 8, 2023, Mr. Payne spoke with Roxanne Tabar, FDNY Equal Employment Opportunity ("EEO") attorney, to report the discrimination, hostility, and hazing he had been experiencing at the FDNY. Specifically, Mr. Payne explained that he had been denied Mutuals partners, unlike his non-Black colleagues, and that he understood this denial as part of the hazing and racially disparate treatment he was experiencing at the FDNY. He further reported the unpaid overtime hours he was forced to work as a probationary firefighter and the resulting uncompensated hours he routinely worked each shift. Rather than guide him on how to initiate the formal EEO complaint process, Ms. Tabar

asked Mr. Payne if he was "sure" he wanted to file a complaint, subtly discouraging him from engaging in protected activity. Ms. Taber's comments caused Mr. Payne to fear further hazing and retaliation if he went forward with a formal complaint.

52. The next day, on June 9, 2023, Mr. Payne initiated the process of filing a formal grievance with his union regarding the discriminatory and hazing conduct he was experiencing, including the denial of a Mutuals partner, and the unpaid overtime and off-the-clock work he was required to perform as a probationary firefighter, by sending an email to the FDNY's General Law Unit asking for certain forms that were required to initiate the process.

53. A few days later, after not hearing back from the General Law Unit, Mr. Payne contacted another FDNY EEO attorney, Nicole Benitez, to whom he reported the discrimination, hostility, and hazing he had been experiencing, including how he had been denied a Mutuals partner and meaningful Mutuals opportunities unlike his non-Black peers; that he was subjected to punitive house watch shifts; and that he was required to work unpaid, off-the-clock hours as a probationary firefighter. Mr. Payne requested that Ms. Benitez proceed with formally filing his complaint in the hopes that the FDNY would investigate and address the misconduct he had reported.

54. While Ms. Benitez apparently filed Mr. Payne's complaint at some unknown date, on January 17, 2024, *months after* Mr. Payne's termination, the FDNY's EEO office issued a finding of "insufficient credible and corroborating evidence to establish that [Capt.] Condon subjected [Mr.] Payne to race discrimination and retaliation in violation of the EEO policy." Critically, before reaching that conclusion, neither Ms. Benitez nor anyone in the FDNY EEO office contacted Mr. Payne to discuss his allegations, to obtain additional information or evidence, or to give him an opportunity to respond to Captain Condon's statement or the statements of other witnesses.

55. Instead, in reaching its determination, the FDNY EEO relied on interviews of the very individuals whom Mr. Payne identified as responsible for the discrimination and hazing, including Capt.

Condon, while failing to meaningfully engage with Mr. Payne at all after his initial meeting with Ms. Benitez. In other words, this was a completely sham investigation.

56. Further, on June 12, 2023, and June 21, 2023, Mr. Payne reached out to Noreen Aspromonte, Chief of Personnel for the FDNY, to request the forms needed to file a formal grievance with his union.

57. However, Ms. Aspromonte never provided Mr. Payne with these forms.

58. Then, just a few weeks after his protected complaints, on July 3, 2023, Mr. Payne was presented with a memorandum dated June 16, 2023, from Joseph R. Cavaretta, Acting Chief of Personnel, addressed to Brian Goldberg, Assistant Commissioner of Civil Service Administration, requesting that Mr. Payne's Probationary Firefighter term be extended for a six-month period, from September 28, 2023, to March 27, 2024. The only explanation that Mr. Payne was given for this extension was that he had taken "sick time."

59. However, this explanation was bogus. Mr. Payne did not take a single sick day during his time at the FDNY. While he did take intermittent FMLA leave to care for his sick daughter, those protected leave days could not be used to punish Mr. Payne.

60. At the same time, Mr. Payne was presented with a separate letter and asked to sign it to indicate his consent to the extension of his probation.

61. In other words, after Mr. Payne engaged in protected activity, including by putting the FDNY on notice of his intent to file a formal union grievance vis-à-vis his repeated requests for the appropriate forms to Ms. Aspromonte and the General Law Unit, and his complaints to EEO attorneys, rather than address the substance of his complaints, the FDNY responded by retaliating against him by baselessly extending his probationary period.

62. Furthermore, in addition to severely limiting Mr. Payne's opportunities to have time off for rest and recovery by treating him differently than non-Black firefighters with respect to Mutuals, the

FDNY also treated him differently and punished him when he sought routine schedule changes. For example, on July 13, 2023, Mr. Payne, who was scheduled for a day shift followed by an evening overtime shift, called Lt. Lopez to request the day off in exchange for his previously worked "self-mutual" shift (working on a scheduled day off to take time off another day). Lt. Lopez agreed to take him off the day shift and directed him to call the Battalion Aide regarding his request to no longer work the overtime shift. Mr. Payne did as he was instructed and the Battalion Aide approved his request and assured him that he would find coverage for Mr. Payne's overtime shift.

63. Nevertheless, Mr. Payne was immediately punished after he requested to change his schedule. That same day, Battalion Chief John Porretto informed Mr. Payne that he was being assigned to work from the FDNY's headquarters in downtown Brooklyn instead of at Ladder Company 24. No reason was given for the abrupt change, but notably, it was made directly after Mr. Payne asked to change his schedule and shortly after he engaged in protected activity.

64. Importantly, assignments to the FDNY's headquarters functioned as a punitive posting. When a firefighter was moved to headquarters, they were required to work five days a week, every week. They were not permitted to do Mutuals and were not allowed to find someone to cover their shifts if they needed additional time off. In other words, assignment to headquarters stripped firefighters of the schedule flexibility that was available to them at their respective firehouses. Also, the work one does when assigned to the FDNY's headquarters is not typical firefighting work – instead, firefighters were relegated to administrative duties.

65. Although Mr. Payne was punished for requesting a schedule change, non-Black employees were not penalized for requesting schedule changes. In fact, Mr. Payne was aware that non-Black firefighters were permitted to make schedule changes without facing discipline since firefighters at Ladder 24 could view overtime records and schedule changes through a shared scheduling portal. Mr. Payne further observed through this portal that non-Black firefighters were allowed to change their schedules

even when they did not have the amount of logged overtime that was ordinarily required to make such schedule changes.

66. Mr. Payne asked Mr. Porretto to identify with whom he could speak about the sudden change in his assignment and was directed to call Capt. Louis Capozzi, from the Bureau of Personnel. Mr. Payne contacted Capt. Capozzi on July 17, 2023, and left him a message. However, Mr. Payne never heard back from Capt. Capozzi or any member of management as to the reason for the abrupt change. Indeed, Mr. Payne was given no reason for it at all.

67. Typically, only injured firefighters or firefighters who were being disciplined were assigned to work at the FDNY's headquarters, but Mr. Payne was, humiliatingly, the only full-duty firefighter assigned to headquarters.

68. Soon thereafter, on August 14, 2023, Mr. Payne received a performance evaluation that falsely accused him of "refus[ing] to carry his tools" on the job.

69. While there had been one occasion in June 2023 in which Mr. Payne mistakenly brought the wrong tools for a particular call (an Ax/Halligan and KO Curtain instead of a Halligan/Hydra ram and KO curtain), he certainly never "refused" to carry his tools.

70. The performance evaluation also falsely stated that Mr. Payne did not do his share of the house duties, when, in fact, he always did his part.

71. Notably, this false performance evaluation too came on the heels of Mr. Payne's reports of discrimination, hostility, and hazing he was experiencing—including the denial of a Mutuals partner, punitive house watch assignments, and the unpaid, off-the-clock hours he was required to work—and after he sought the requisite forms to initiate the FDNY's formal grievance process with his union. It was abundantly clear that, rather than address Mr. Payne's protected complaints, the FDNY began instead to create and rely on a false "performance" narrative to justify adverse action against him.

72. On August 18, 2023, Mr. Payne submitted a written complaint to FDNY Supervisor of Annuals Frank Groce. In the complaint, Mr. Payne stated, in part, as follows:

> "I am filing this formal complaint to bring attention to the unlawful, unjust, and discriminatory treatment that I have experienced within the FDNY….Numerous non-African American members within my company Ladder 24 have been consistently allowed to do mutuals. On the other hand, I have been denied mutual opportunities, despite meeting the requirements. I have been in my firehouse for 11 months and was never given a 24 partner to do mutuals with. In the engine which is also housed in the same quarters the new probationary firefighters that are both non-African American members have been assigned one another as mutual partners from the moment that they began working in the firehouse."

73. Mr. Payne stated that, although he had repeatedly asked to work Mutuals with fellow firefighters at the firehouse, "they have created the hostile work environment using discrimination and exclusion….", preventing him from doing so.

74. According to FDNY procedure, after receiving a grievance such as Mr. Payne's, the FDNY is supposed to conduct a Step 1 Hearing, which is an opportunity for the aggrieved firefighter to be heard. Yet, not only was there no hearing, but the FDNY failed to respond to the grievance at all. In fact, no one ever reached out to Mr. Payne about his complaint.

75. Undaunted by once again being ignored by the FDNY's top brass, Mr. Payne submitted a second complaint to Mr. Groce on August 30, 2023, in which he clearly stated: "Specifically, this complaint addresses race discrimination, the creation of a hostile work environment and hazing…." He went on to report in detail the numerous hours of unpaid work he was required to perform each shift:

> "Over the past 16 months[,] I've also come to realize that the denied compensation for time worked[,] specifically overtime[,] began the moment probationary firefighters were sworn in at the [R]ock and began their FDNY academy training and FDNY careers…This practice not only violates the FDNY Policies and Procedures and constitutes an abuse of power within my firehouse as well as the FDNY as a whole, this forced work with payment being withheld is modern[-]day slavery not to mention a form of hazing which the FDNY also has policies and procedures supposedly [p]rohibiting these types of behavior."

76. Once again, the FDNY failed to respond to or investigate Mr. Payne's complaints. Indeed, no one at the FDNY ever reached out to him about his complaint or the grievance process.

77. Upon information and belief, the FDNY made absolutely no effort to investigate or correct either the unlawful compensation practices to which Mr. Payne referred in his second complaint – despite already being aware of this "global issue"[4]– or the discriminatory denial of a Mutuals partner asserted in his first complaint.

## VI. Mr. Payne Is Terminated Approximately Four Weeks After His August 30, 2023 Complaint

78. Instead of addressing his complaints, the FDNY retaliated against Mr. Payne by firing him on September 26, 2023, just two days before the end of his probationary period. On that day, after Mr. Payne had completed his shift, he was summoned to a meeting with Chief Joseph Cavaratta. In that meeting, Chief Cavaratta informed Mr. Payne that the FDNY was terminating his employment effective immediately. No reason was offered for the termination.

79. Rather than address and investigate Mr. Payne's complaints of racial discrimination and unlawful wage practices as it is legally required to do, the FDNY chose the "easy way out" by unlawfully terminating his employment instead.

## FIRST CAUSE OF ACTION
**(Discrimination and Harassment in Violation of Section 1983)**

80. Section 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

81. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the

---

[4] *See* footnote 2, *infra*.

preceding paragraphs as if fully set forth herein.

82. By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of Section 1983 by, *inter alia*, denying him the equal terms and conditions of employment because of his race, in violation of, *inter alia*, 42 U.S.C. § 1981 (Section 1981).

83. At all relevant times, Defendant acted under the color of state law.

84. As alleged above, Plaintiff was subjected to unequal terms and conditions of employment on the basis of race, including *inter alia*, being denied a Mutuals partner while other non-Black probationary firefighters were assigned Mutuals partners; being denied Mutuals opportunities and subjected to differential restrictions on Mutuals; being targeted with punitive and excessive "house watch" assignments; and being subjected to false and exaggerated accusations concerning his performance and conduct, notwithstanding Plaintiff's actual performance and conduct as alleged above.

85. Defendant's conduct, as alleged above, was intentional and had the purpose and effect of treating Plaintiff differently from similarly situated non-Black firefighters because of Plaintiff's race, in violation of Section 1983 and Section 1981.

86. Defendant's acts and omissions alleged herein were caused by and/or carried out pursuant to Defendant's policies, practices, and/or customs, including, *inter alia*, policies, practices, and/or customs of tolerating racially discriminatory treatment and hazing of probationary firefighters, denying Black probationary firefighters equal access, failing to investigate, remedy, or stop discriminatory conduct after complaints were made, and permitting supervisors and management to rely on pretextual performance reviews to justify adverse action.

87. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1983 and Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

88. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in

violation of Section 1983, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

89. Plaintiff is also entitled to payment of his attorneys' fees and litigation costs from Defendant.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1983)**

90. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

91. Plaintiff engaged in protected activity by, *inter alia*, complaining internally about race discrimination and seeking to invoke the FDNY's grievance procedures and requesting assistance and forms required to initiate the grievance process.

92. After Plaintiff engaged in the protected activities described herein, Defendant subjected Plaintiff to adverse employment actions that would deter a reasonable employee from engaging in such activity, including, *inter alia*, reassigning Plaintiff, interfering with his schedule and overtime opportunities, issuing false performance reviews, and ultimately terminating Plaintiff.

93. Defendant's acts and omissions alleged herein were caused by and/or carried out by Defendant's policies, practices, and/or customs, including, *inter alia*, policies, practices, and/or customs of retaliating against employees.

94. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1983 and Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

95. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1983 and Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damage.

96. Plaintiff is also entitled to payment of his attorneys' fees and litigation costs from Defendant.

**<u>THIRD CAUSE OF ACTION</u>**
**(Retaliation in Violation of the FLSA)**

97. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

98. By the actions detailed above, among others, Defendant unlawfully retaliated against Plaintiff for complaining about FLSA violations at the FDNY.

99. Plaintiff engaged in protected activity known to Defendant by complaining internally about unpaid work hours.

100. Shortly after Mr. Payne made that complaint, the FDNY took an employment action disadvantaging him – specifically, the FDNY terminated his employment, causing him to sustain economic and non-economic damages.

101. A causal connection exists between the protected activity and the adverse employment action based, *inter alia*, on the temporal proximity of the termination to the complaint.

102. As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of the FLSA, Plaintiff has suffered, and continues to suffer, lost wages and emotional distress, for which he is entitled to an award of damages.

103. Defendant's unlawful retaliatory actions violated the FLSA, and Plaintiff is entitled to all legal and equitable relief available under 29 U.S.C. § 216(b), including lost wages, and an additional equal amount as liquidated damages, as well as attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYSHRL)**

104. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

105. By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying him the equal terms and conditions of employment because of his race.

106. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

107. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**(Retaliation in Violation of NYSHRL)**

108. Plaintiff hereby repeats and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

109. By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on his protected activities in violation of the NYSHRL.

110. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

111. As a direct and proximate result of Defendant's unlawful retaliatory conduct in

violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

**<u>SIXTH CAUSE OF ACTION</u>**
**(Discrimination in Violation of NYCHRL)**

112. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

113. By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying him the equal terms and conditions of employment because of his race.

114. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

115. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

**<u>SEVENTH CAUSE OF ACTION</u>**
**(Retaliation in Violation of NYCHRL)**

116. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

117. By the actions detailed above, among others, Defendant has retaliated against Plaintiff based on his protected activities in violation of the NYCHRL, including terminating Plaintiff's employment.

118. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for

which he is entitled to an award of damages, in addition to reasonable attorneys' fees and expenses.

119. As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which he is entitled to an award of damages.

**EIGHTH CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**

120. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

121. Defendant retaliated against Plaintiff for engaging in protected activity by lawfully exercising his FMLA rights by *inter alia*, extending his probationary period for taking FMLA leave.

122. The timing and nature of Defendant's conduct establish a direct and casual connection between Plaintiff's protected activity and the retaliatory treatment he endured.

123. Defendant's actions were intentional, willful, and in bad faith, and in violation of 29 U.S.C. § 2615(a)(2).

124. As a direct and proximate result, Plaintiff has suffered and continues to suffer substantial damages, including lost wages, liquidated damages, and attorneys' fees and costs, for which he is entitled to an award.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter:

A. A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B. An injunction and order permanently restraining Defendant and any and all persons acting in concert with it, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C. An order directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

D. An order directing Defendant to reinstate Plaintiff to his former position restoring all rights, benefits, seniority, and other privileges of employment.

E. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

F. An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages;

G. An award of punitive and/or liquidated damages and/or a civil penalty to the fullest extent permitted by law;

H. Pre-judgment interest on all applicable amounts due;

I. Post-judgment interests on all applicable amounts due;

J. An award of costs that Plaintiff incurs in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

K. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 30, 2025
White Plains, New York

Respectfully submitted,

**FILIPPATOS PLLC**

By:______________
Tanvir H. Rahman
Gabrielle Rosen Harvey
199 Main Street, Suite 800
White Plains, New York 10601
T/F: 914.984.1111 (x505)
trahman@filippatoslaw.com
grosenharvey@filippatoslaw.com

*Attorneys for Plaintiff*